## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER STOLTZ,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-CV-5622** |
| | : | |
| **COUNTY OF LANCASTER,** | : | |
| **BONNIE ASHWORTH, LORE VERNE,** | : | |
| **RYAN GAJECKI, and JAMES** | : | |
| **HACKETT** | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

Stengel, J.                                                        March ⁷ , 2011

Jennifer Stoltz was employed by Lancaster County in the Parks Department from November 2004 to July 2009, when she accepted a position with the Lancaster County Sheriff's Department. In 2006, Ms. Stoltz was injured during gun training. She was on worker's compensation leave from March 2006 through May 2007, when she returned to a light-duty position. She returned to her full-time ranger position in May 2009.

Ms. Stoltz raises due process violation claims, a First-Amendment retaliation claim, gender discrimination and hostile work environment claims, a violation of the Americans with Disability Act claim, and various state law claims. Defendants Lancaster County, Bonnie Ashworth, Lore Verne, Ryan Gajecki, and James Hackett filed a motion for summary judgment. For the reasons set forth below, I will grant the motion.

I.    BACKGROUND

A.    Parks Department

Lancaster County hired Jennifer Stoltz in November 2004 as a park ranger. Ryan Gajecki was hired as a seasonal unarmed park ranger in 2000, returned as a seasonal armed park ranger in 2001, and later became a full-time park ranger. Lancaster County hired Lore Verne as chief ranger in 1998. James Hackett began working for Lancaster County as Executive Director of the Parks Department in December 2003. Paul Weiss has been employed by Lancaster County since 1999. He was hired as assistant director of the Parks Department.[1] Charles Dout began working for Lancaster County in July 2008 as the County Administrator. Bonnie Ashworth was the assistant and acting human resources director when Ms. Stoltz was injured and when a light-duty position was created for her.

During Ms. Stoltz's employment, there was one female intern in the Ranger Department. Other female rangers had worked for Lancaster County in the past, but their tenure was brief. The ranger station had only one restroom/locker room.[2] Some male rangers would change in front of Ms. Stoltz, come out of the locker room area with their shirts off or pants undone, unzip their pants to tuck in their shirts, and appear in their

---

[1]  Mr. Weiss also served as interim executive director and is now the Parks and Recreation administrator.

[2]  Mr. Verne wanted a new or remodeled station in part because of the lack of a separate restroom and locker room.

boxers. One ranger appeared in a cowboy outfit that exposed his chest and an area on his upper leg.

When the rangers would come out of the locker room with their shirts off or pants unzipped, Ms. Stoltz would tell them to put on their clothes. Ms. Stoltz talked to Mr. Verne, Mr. Hackett, Mr. Weiss, and Ms. Chan about the situation. Mr. Verne advised the rangers to come out of the locker room fully clothed. A memorandum also was sent informing the rangers to come out of the locker room fully clothed.

As part of their work, rangers would catch individuals engaging in sexual activity in the park. The rangers sometimes would demonstrate the sexual positions, discuss the physical attributes of the individuals, and talk about their own sex lives. These discussions occurred daily during shift change. Ms. Stoltz told Mr. Verne and Mr. Hackett about the discussions.[3]

Prior to 2004, Mr. Gajecki and Mr. Verne went to a strip club. Other rangers, including a female ranger, also went to the strip club.

All rangers were counseled on the appropriate use of the internet. In 2002, Mr. Gajecki received a warning regarding an abuse of the internet privilege for viewing and printing pornography. He was prohibited from using the internet for one year. In 2008,

---

[3] Ms. Stoltz alleges she reported the harassment to Ms. Ashworth because she filed a charge of discrimination in July 2007. The charge of discrimination states "I am the sole female Park Ranger . . . . I am treated differently because I am a woman. I am denied equal wages. I am subjected to derogatory and offensive comments from my male co-workers. My male co-workers refuse to acknowledge my existence, ignore my professional opinions and exclude me from work matters." Plaintiff's Counter Statement of Facts at Exh. Y.

when Mr. Gajecki was interim chief, he circulated the internet policy after he learned of two alleged inappropriate internet site visits. When Mr. Douts learned of a possible internet violation, he requested that the information technology department conduct an investigation. The investigation did not produce any evidence to support the allegation.[4]

Ms. Stoltz's fellow rangers did not take her opinions and suggestions seriously and would do the opposite of what Ms. Stoltz suggested. Rangers also rejected the ideas of Chad Shaneyfelt, a fellow ranger. When she was assigned to the pool on a light-duty basis, Ms. Stoltz was excluded from ranger work matters. The other rangers did not speak with her and she was precluded from being on the premises of the ranger station and from calling the ranger station.

Other rangers failed to provide Ms. Stoltz with backup. Mr. Verne met with the rangers to stress the importance of providing back-up. Ms. Stoltz also testified that when the rangers provided back-up, they took over her cases. The rangers also failed to provide back-up to Mr. Shaneyfelt.[5]

---

[4] Ms. Stoltz attempts to rely on the termination of a female ranger in 2006 to support her claim that females were treated different from males. That ranger had filed a discrimination case, which settled. The ranger alleged she was harassed by a male co-worker. The County alleged the plaintiff was terminated after she used the County email system to send inappropriate and lewd emails to co-workers, including the man she alleged was harassing her. In addition, the County alleged it discovered she had a friendly relationship with her alleged harasser. I will not consider this employee's termination because it has little probative value and is unduly prejudicial.

[5] Ms. Stoltz alleges the rangers failed to provide back-up for Mr. Shaneyfelt because of his association with Ms. Stoltz.

B.    Ms. Stoltz's Injury

On March 4, 2006, Ms. Stoltz was injured during shotgun training. She discussed the injury with Ms. Ashworth. She explained that before she began her training, Mr. Gajecki went over the parts of the gun with her but that he had not shown her where to place the gun. When she shot the gun the first time, it bounced. It continued to bounce on further use. Ms. Stoltz told Mr. Gajecki that she could not continue because her arm was shaking, but he told her that she had to continue because she could not stop shooting in a real-life situation. Mr. Gajecki required that Ms. Stoltz shoot approximately ten more rounds. Mr. Gajecki did not require that Ms. Stoltz perform the second part of the shotgun training.

Ms. Stoltz's arm was bruised from her shoulder down her arm. She suffered a right shoulder contusion, pain, and stiffness. Ms. Stoltz called Mr. Verne when she left the range, and he recommended that she go to the hospital. The day of the injury, Mr. Verne pulled Mr. Gajecki from the range for the day. Mr. Gajecki was prohibited from performing future range instruction.

Mr. Gajecki and Ms. Stoltz completed reports of the incident, and Mr. Verne created a narrative of the incident reports. Ms. Ashworth conducted an investigation of the incident and interviewed witnesses.

Ms. Stoltz was told Mr. Verne stated to other rangers that she was faking her injury. She was told Mr. Verne discussed her medical condition and told people the

5

doctors she visited. Mr. Verne told Lisa Sanchez, a naturalist with the Parks Department, that Ms. Stoltz was seeing various doctors for a worker's compensation injury. Mr. Verne sent an email to Mr. Hackett stating that he did not believe the doctors could find anything physically wrong with Ms. Stoltz and he believed her inability to resume full duties mostly was mental. Ms. Stoltz maintains Ms. Ashworth sent an email stating the doctors could find nothing wrong with Ms. Stoltz and Ms. Ashworth talked with Mr. Verne about Ms. Stoltz's medical condition.

## C. Ms. Stoltz's Light-Duty Positions

Ms. Stoltz was off work from March 2006 until May 2007. When Ms. Stoltz returned to work, the doctor restricted her to duties that could be accomplished using only her left arm/hand. Her physician sent a form regarding her physical capabilities.[6] Ms. Stoltz returned to a position at the County pool. Her physician required that Ms. Stoltz use a headset to answer the phone. Ms. Stoltz maintains she was not provided this headset until counsel intervened on her behalf.

Helen Mohler, Mr. Gajecki's mother-in-law and Ms. Stoltz's supervisor at the

---

[6] Ms. Stoltz now claims she could perform the park ranger functions with a reasonable accommodation but was not permitted to do so. Ms. Stoltz relies on an affidavit she submitted with her response to defendants' motion for summary judgment.

"When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991). At her deposition, Ms. Stoltz stated she could not perform the essential functions of the park ranger position, including patrolling the park, placing a suspect in custody, climbing, and performing emergency functions. Because Ms. Stoltz's affidavit contradicts this testimony and the evidence, I will disregard the affidavit.

6

pool, disciplined Ms. Stoltz for using the telephone to call the ranger station without permission. According to Mr. Shaneyfelt, Mr. Gajecki admitted instructing Ms. Mohler to discipline Ms. Stoltz. Ms. Stoltz did not lose any pay or time at work because of the discipline.

Ms. Stoltz worked at the pool until September 2007, when she again went out on worker's compensation leave because the Parks Department did not have a position available. In November 2007, Ms. Ashworth, Mr. Weiss, and Mr. Verne participated in a meeting with Ms. Stoltz to discuss her physical capabilities as they related to her position as a park ranger. Prior to the meeting, Ms. Stoltz was given a park ranger job description that she discussed with her physician and attorney. Ms. Stoltz's attorney indicated on the job description what functions Ms. Stoltz could perform and which she could not perform.[7]

---

[7] The job description indicates Ms. Stoltz could: Patrol the park system by foot, bicycle, and motor vehicle; conduct ongoing security checks and inspections; assist park system visitors in obtaining information and department services; work outdoors in all types of weather; operate a 4X4 vehicle; speak clearly and effectively in person, by telephone and radio; write clearly and effectively; read and comprehend legal and non-legal documents; communicate and work effectively with people of diverse cultural backgrounds, physical abilities, mental abilities, races, religions, ages, lifestyles, and beliefs; endure verbal and mental abuse when confronted with hostile views and opinions of suspects and other persons encountered in an antagonistic environment; conduct public speaking assignments and education programs; enforce Pennsylvania Statutes; enforce Lancaster County Park Ordinance # 10; gather information in criminal and/or accident investigations; and conduct visual and audio surveillance. At her deposition, she testified that she could not perform some of these items, such as patrolling by foot or bike.

The job description indicates Ms. Stoltz could, with her left hand only: perform light and emergency maintenance duties; use a computer, computer software, telephone, radio, issued baton, issued O.C. spray, first aid supplies and protection; and perform searches of people

For a period of time Ms. Stoltz was not in uniform because people would assume she would be capable of performing all ranger functions in an emergency situation.[8] Mr. Verne create a "Limited Ranger Duties" document outlining light, medium, and full-ranger duties. When she returned to work in November 2007, Ms. Stoltz performed all of the duties listed as light duty except patrolling the park by foot, which she agreed she was not physically capable of doing. Ms. Stoltz was given a "duty schedule sheet" which set forth her duties, including assisting the rangers in opening the park, and administrative duties such as filing, entering incidents, research, work projects, station duties, and doing a mail run. The sheet included a note that on Mondays Ms. Stoltz would empty the trash cans, mop the restroom and entry area floor, clean the sink and toilet, and clean the office equipment if needed.

Ms. Stoltz objected to the duties of opening the gates to the parks, driving a vehicle, emptying the trash cans, mopping the restroom and entry area floor, and cleaning

vehicles, building, and outdoor areas.

The job description indicated Ms. Stoltz could not affect an arrest or perform rescue functions at accidents, emergencies and during natural disasters, and could not use a fire extinguisher, shovel, chain saw, or issued firearm. In addition, although it indicated Ms. Stoltz could pursue a fleeing suspect, she could not climb over and pull up over obstacles or crawl in confined spaces.

[8] Ms. Stoltz claims she could not perform the ranger duties because Mr. Verne would not allow her to wear the uniform. At her deposition she testified she could not patrol in a marked vehicle because she was not in uniform, could not patrol by bike because of the shoulder injury, and could not patrol on foot because she could not defend herself. Plaintiff's Response at Exh. II at 114. In addition, she stated Mr. Verne did not want her chasing a suspect, but also stated her physician did not want her "out there where I had any chance on being injured if something went wrong." Id. at 119.

8

the sink and toilet. She objected to the cleaning duties because she could not physically perform them, she did not believe the other rangers performed them,[9] and they were demeaning. She alleges the rangers destroyed the bathroom because she was assigned to clean it. When Ms. Stoltz objected, the cleaning duties were removed from her duty list.[10] Ms. Stoltz never cleaned the bathroom and emptied the trash only when it was overflowing. She stated other rangers also emptied the trash when it was overflowing.

An unarmed seasonal park ranger must patrol the park by foot, bicycle and motor vehicle; conduct light and emergency maintenance duties; operate a 4X4 vehicle; enforce statutes and ordinances through verbal and written warnings; detain individuals; pursue suspects, including climbing over and pulling up oneself over obstacles, ditches and streams, crawling in confined areas, and balancing on uneven or narrow surfaces; and perform rescue functions, administering first aid, lifting, carrying and dragging equipment or removing victims from an immediate danger. Unarmed seasonal park rangers wore different uniforms than the full-time armed park rangers. The position was discontinued and did not exist when the Parks Department created Ms. Stoltz's light-duty position.

_____

[9] During their employment as rangers, Mr. Gajecki, Mr. Shaneyfelt, and Mr. Weimer had periods where they lacked weapons certification. During these periods, they were reassigned to the maintenance department. In addition, Mr. Verne testified that he, Mr. Hawn, and Mr. Whitman all mopped the floors during their employment. Mr. Shaneyfelt and Mr. Hawn emptied trash cans.

[10] Ms. Stoltz maintains the duties were removed because counsel intervened and cites to the EEOC Notice to the County. The notice, however, does not mention the cleaning duties.

Ms. Stoltz's work mostly was within the ranger station performing administrative functions. Ms. Stoltz contends she was ridiculed and demeaned. Mr. Verne and Mr. Gajecki referred to her as a secretary. The rangers laughed at her because she could not do normal ranger duties.

In April 2009 Ms. Stoltz was released from work restrictions. There was a month delay before she returned to a full-duty park ranger position because she had to be re-qualified on her firearm.

D.    Mr. Verne

In June 2008, Mr. Verne's conduct towards Ms. Stoltz became more aggressive. He would yell and flip out at Ms. Stoltz when the other rangers were not around. Mr. Verne would yell at Ms. Stoltz for reporting matters to Mr. Hackett. He threw a stress ball off his desk at the wall. Mr. Verne also lost his temper with other rangers, including Mr. Shaneyfelt.

On June 23, 2008, Ms. Stoltz, Mr. Shaneyfelt, and Mr. Whitman met with Mr. Hackett to discuss Mr. Verne's conduct. Earlier that day Mr. Verne had argued with Mr. Shaneyfelt about damage to one of the ranger vehicles. When the rangers arrived at Mr. Hackett's office, he was on the phone with Mr. Verne. At the meeting, the rangers reported, among other things, that Mr. Verne discussed the rangers' personal information, stated he did not care what happened to the department, stated he wanted to shoot "niggers and horses," and misreported his work hours on time cards. Mr. Hackett told the

rangers he would look into the allegations. He informed Mr. Verne that he felt the rangers as a group did not respect Mr. Verne.

Mr. Hackett conducted an investigation and concluded some of the behavior had occurred, including divulging personal information, not managing the staff, talking critically about employees and law enforcement agencies, cancelling staff meetings, and lack of guidance. He did not formally present these finding to Mr. Verne but did meet with the Commissioners.

Mr. Verne told Ms. Stoltz to "leave and do the County a favor,"and told her he did not believe there was anything wrong with her shoulder. On June 25, 2008, Mr. Verne pushed Ms. Stoltz, causing an aggravation of her shoulder injury. This incident occurred when Mr. Verne and Mr. Shaneyfelt had a dispute. Mr. Shaneyfelt contacted Ms. Stoltz to come outside to witness the interaction. Mr. Verne told Ms. Stoltz to go back inside the station. Mr. Verne contacted Mr. Hackett to assist with the dispute. While Mr. Hackett was speaking with Mr. Shaneyfelt, Mr. Verne told Ms. Stoltz to go inside. Ms. Stoltz testified she turned around and when her back was towards Mr. Verne he said "I told you to f'in get back in the station and I mean now," and pushed her. Ms. Stoltz felt a pop in her shoulder.

Everyone returned to the ranger station and Mr. Hackett advised them to start working out their differences. Mr. Hackett turned the matter over to human resources, and Ms. Ashworth conducted interviews. When Ms. Stoltz met with Ms. Ashworth

11

following the June 25th incident, she also reported that a tranquilizer gun still was in the ranger department even though she believed it was not permitted.

Mr. Verne began disappearing from the station. Mr. Verne yelled at Ms. Stoltz, Mr. Shaneyfelt, and Mr. Whitman. On or about July 21, 2008, Ms. Stoltz reported to Ms. Ashworth that Mr. Verne had disappeared with a firearm for several hours. Mr. Verne changed the locks on the gun locker. Shortly after this, Mr. Verne resigned from the Ranger Department and was escorted from the premises.

E.    Mr. Gajecki as Interim Chief

After Mr. Verne's resignation, Mr. Gajecki became interim chief because he was the most senior ranger. Ms. Stoltz testified Mr. Gajecki exhibited contempt, disdain, and anger toward her. He never apologized following her injury. She was told by other rangers that Mr. Gajecki was angry that he was not able to be a range instructor.

Mr. Gajecki gave her a negative performance evaluation, rating her as "fails to meet expectations" in the "professional and human relations" category for reporting matters involving the Department to other agencies and departments in the County. Andrea McCue,[11] Mr. Hackett, and Mr. Gajecki were present when Ms. Stoltz received the performance review. Ms. McCue and Mr. Hackett prepared most of the section in which Ms. Stoltz was evaluated as fails to meet expectations. Ms. Stoltz received a "fails

---

[11] Ms. McCue was the interim human resources director after Ms. Ashworth's departure.

12

to meet expectations" in one category, an "exceeds expectations" in two categories, and a "meets expectations" in four categories. Ms. Stoltz received a raise as a result of the evaluation.

When Ms. Stoltz was on medical leave in August 2008, Mr. Gajecki told the other rangers she was out for surgery even though she did not want others to know. Mr. Gajecki also spoke about Mr. Shaneyfelt's private affairs.

F.    Other Reports

In March 2009, Mr. Shaneyfelt told Ms. Stoltz that a box of her cereal was spilled onto the floor and scooped back into the box. She reported the incident to Mr. Hackett, who disregarded it. Around the same time, Mr. Hackett replied "who cares" when Ms. Stoltz told him that he grabbed a stock of her papers.

Ms. Stoltz reported the cereal incident to Wendy Chan, Ms. Ashworth's replacement in human resources. Ms. Chan talked with the other employees and directed Mr. Gajecki to conduct an investigation. Mr. Gajecki interviewed the rangers and placed in his findings that no one knew anything about the incident.

Ms. Stoltz also reported to Ms. Chan that one of the rangers used a ranger truck for personal purposes, and discussed with Ms. Chan that she was not being treated fairly, Mr. Hackett did not address matters she raised, and the rangers were not fully clothed in the station. Mr. Dout told Ms. Chan to stop supporting Ms. Stoltz. Ms. Chan alleges Mr. Dout told her this because Ms. Stoltz was not liked. Mr. Dout testified he told Ms. Chan

13

this because he thought Ms. Stoltz should go to Mr. Hackett with complaints that did not involve him, rather than to the human resources department.

Ms. Stoltz discussed her allegations of harassment and discrimination with Sheriff Terry Bergman before and after she was transferred to the Sheriff's Office. Mr. Hackett threatened Ms. Stoltz's employment by telling her that he would fire her if he discovered she was reporting the Parks Department to other departments.

G.    Ms. Stoltz's Transfer to the Sheriff's Department

On July 10, 2009, Ms. Stoltz transferred from the Parks Department to the Sheriff's Office. She had applied for the position in or around March 2009, was interviewed, and was selected for the position. The Sheriff's Department was aware of Ms. Stoltz's injury, the issues with the Parks Department, and the pending litigation.

On May 3, 2010, Ms. Stoltz commenced the deputy sheriff academy. On May 12, 2010, she tore the meniscus in her left knee. Because of her injury, she cannot continue with the academy and will not have a job at the Sheriff's Department.

Count I of Ms. Stoltz's complaint alleges a section 1983 violation based on due process, the First Amendment, and equal protection. Count II of Ms. Stoltz's complaint alleges a violation of Title VII of the Civil Rights Act of 1964. Count III alleges a violation of the Americans with Disabilities Act. Count IV alleges a violation of the Pennsylvania Human Relations Act. Count V alleges a violation of Ms. Stoltz's right to solitude or seclusion of her private and personal affairs. Count VI alleges a defamation

14

claim. Count VII alleges a negligent supervision claim. Count VIII alleges a negligent infliction of emotion distress claim and an intentional infliction of emotional distress claim. Count IX alleges an assault and battery claim against the County and Mr. Verne.

II.     STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

15

admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1).

Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.    DISCUSSION

A.    Procedural Due Process

The Fourteenth Amendment of the United States Constitution prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a violation of the Fourteenth Amendment the individual interest must be "encompassed within the [F]ourteenth [A]mendment's protection of life,

16

liberty, or property." Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005) (Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).

      1.    Property Interest

     Ms. Stoltz alleges she had a property interest in her job. "To have a property interest in a job, . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." Elmore, 399 F.3d at 282 (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). State law determines whether a property interest exists. Id. (citing Brown v. Trench, 787 F.2d 167, 170 (3d Cir.1986)). In Pennsylvania, a public employee "generally serves at the pleasure of her employer and thus has no legitimate entitlement to continued employment." Id. "A local government . . . cannot provide its employees with tenure status unless there exists express legislative authority for doing so." Id.

     Ms. Stoltz alleges she has a cognizable property interest in her job because the Lancaster County Policies and Procedures state that "[n]o full time employee shall be terminated except for just cause." In Elmore, the plaintiff claimed there was an exception to the general rule that public employees do not have a property interest in their jobs where a personnel policy handbook stated the "township shall take no disciplinary action against an employee without just cause." 399 F.3d at 280, 282. The United States Court of Appeals for the Third Circuit found the plaintiff did not have a property interest in her

job "sufficient to implicate the Due Process Clause." Id. at 283. It reasoned there was no Pennsylvania statute that would permit the township to grant employment to office managers "on anything other than an at-will basis." Id. The township did not have authority to confer "just cause" employment status. Id.

Ms. Stoltz relies on Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008) to support her claim that she had a cognizable property interest. In Dee, the firefighter plaintiff's employment was protected by a statute, 53 Pa. Stat. § 46190, which provided that "[n]o person employed in any . . . fire force of any borough shall be suspended, removed or reduced in rank" except for one of six enumerated reasons. Dee 549 F.3d at 230.

Ms. Stoltz fails to establish a property interest in her position with Lancaster County. Unlike the employment position in Dee, no statute protects Ms. Stoltz's position. The employee handbook did not confer a right to employment. I will grant the defendants' summary judgment motion regarding Ms. Stoltz's claim regarding a property interest.

2.    Liberty Interest

"[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)) (emphasis deleted).

18

"[R]eputation alone is not an interest protected by the Due Process Clause." Id. (quoting Versarge v. Twp. of Clinton, NJ, 498 F.2d 1359, 1371 (3d Cir. 1993)) (emphasis deleted). If an employer "'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." Hill, 455 F.3d at 236 (quoting Codd v. Velger, 429 U.S. 624, 628 (1977)). A public employee "who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." Id. at 238.

Ms. Stoltz alleges false statements were made regarding her "faking" her injury, and that she was regarded as a trouble-maker, snitch, and a person to avoid. She was shunned by the male rangers.

Ms. Stoltz fails to identify a genuine issue of material fact regarding her deprivation of a liberty interest claim. The allegedly defamatory statements were not made in connection with a termination of employment or with any alleged constructive discharge.[12] She cannot satisfy the stigma-plus test for establishment of a protected

---

[12] Ms. Stoltz alleges she was forced out of her employment with the Parks Department. To establish a constructive discharge claim a plaintiff must show "the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Colwell v. Rite Aid Corp., 602 F.3d 495, 502 (3d Cir. 2010) (quoting Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001)). "Factors [the Third Circuit] ha[s] found relevant to this issue are whether the employer (1) 'threatened [the employee] with discharge' or 'urge[d] or suggest[ed] that she resign or retire,' (2) 'demote[d] her,' (3) 'reduce[d] her pay or benefits,' (4) 'involuntarily transferred [her] to a less desirable position,' (5) altered her 'job responsibilities,' or (6) gave 'unsatisfactory job evaluations.'" Id. at 503 (quoting Clowes v.

liberty interest.

B.     Substantive Due Process

To establish a substantive due process claim, the government must infringe upon a "fundamental interest." "[A] non-legislative government deprivation 'that comports with procedural due process may . . . give rise to a substantive due process claim upon allegations that the government deliberately and arbitrarily abused its power.'" Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d Cir. 2000) (quoting Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1179 (3d Cir. 1997)).

Whether a property interest is protected under the substantive due process clause "depends on whether that interest is 'fundamental' under the United States Constitution." Id. Public employment is not a property interest entitled to substantive due process protection. Nicholas, 227 F.3d at 142. Similarly, a "stigma plus" liberty interest does not receive substantive due process protection. Schlicter v. Limerick Twp., 2005 WL 984197, at *8 (E.D. Pa. Apr. 26, 2005) (citing Pulchaski v. Sch. Dist. of Springfield, 161 F.Supp.2d 395, 406 (E.D.Pa.2001)).

Ms. Stoltz also alleges equal protection rights are "fundamental rights" protected by substantive due process. She provides no support for this contention. She relies on Bradley v. Pittsburgh Bd. of Education, 913 F.2d 1064, 1079 (3d Cir. 1990), which found

---

Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993)). Ms. Stoltz fails to present evidence to establish a constructive discharge claim.

20

Title VII did not preclude an equal protection claim. It did not address whether equal protection was a fundamental right protected by the due process clause.

I will grant defendants' motion for summary judgment on Ms. Stoltz's substantive due process claim.

C.     First Amendment Retaliation

To establish a retaliation claim for engaging in activity protected under the First Amendment, a public employee must establish: (1) the public employee engaged in protected activity; and (2) the protected activity was a substantial factor in the alleged retaliatory action. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). "[T]he employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Hill, 411 F.3d at 125 (Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1997)).

To engage in protected speech, an employee must be speaking "as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). If the employee is speaking as a citizen on a matter of public concern, it must be determined "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id.

"[S]peech addresses a matter of public concern when it relates to an issue of 'political, social, or other concern to the community.'" McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (quoting Connickk v. Myers, 461 U.S. 138, 146 (1983)).

21

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Foraker v. Chaffinch, 501 F.3d 213, 239 (3d Cir. 2007) (quoting Garcetti, 547 U.S. at 421). Whether speech addresses a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." Hill, 455 F.3d at 242 (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)). "[W]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." Foraker, 501 F.3d at 240.

In Foraker, state troopers reported corruption and unsafe conditions to their superiors. The United States Court of Appeals for the Third Circuit found this speech was not protected. Foraker, 501 F.3d at 243. The court reasoned reporting problems at the firing range was among the tasks the plaintiffs were paid to perform. Their positions required they report up the chain of command and environmental concerns were within the scope of their routine operations because they used and maintained the equipment. Id. at 241-42. Their annual performance reviews also suggest they were involved in workplace safety. Id. at 242. Similarly, in Conard v. Pa. State Police, 360 Fed. Appx. 337 (3d Cir. 2010), the plaintiff, a police dispatcher, made a telephone call to an officer's supervisor about the officer's failure to respond to a shooting incident. The Third Circuit found this telephone call was within her duties even though it was not to her supervisor

22

because it regarded a police emergency and was performed in the course of her duties. Conard, 360 Fed. Appx. at 340.

Ms. Stoltz alleges she, Mr. Shaneyfelt, and Mr. Whitman reported Mr. Verne's aggressive and dangerous behavior to Mr. Hackett. They were concerned about the public's welfare and safety because Mr. Verne had easy access to guns and ammunition. Ms. Stoltz later reported that Mr. Verne disappeared with a loaded rifle and he tampered with the lock on the gun locker so only he could access it.

I will grant defendants' motion for summary judgment for Ms. Stoltz's First Amendment retaliation claim. Ms. Stoltz fails to identify a genuine issue of material fact concerning whether she was speaking as a citizen on a matter of public concern. Her statements were made to a supervisor during work hours. As a park ranger, her job duties included providing protection to park visitors and conducting "law enforcement duties." In addition, at the meeting with Mr. Hackett, the rangers also discussed Mr. Verne's disclosure of private information, failure to keep accurate time cards, and other work-related discretions.

D.      Section 1983 Conspiracy

To establish a section 1983 conspiracy claim, a plaintiff must show "that persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. Of Educ. v. N.E. Ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999). A plaintiff must show a "combination, agreement, or understanding among all or between

any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." Santucci v. Gross, 2007 WL 2688650, at *5 (E.D. Pa. Sept. 10, 2007) (quoting Piskanin v. Hammer, 2005 WL 3071760 at *4 (E.D. Pa. Nov. 14, 2005)). "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient." Id. (quoting Piskanin, 2005 WL 3071760, at *4).

Ms. Stoltz maintains Ms. Ashworth, Mr. Hackett, Mr. Verne, and Mr. Gajecki acted together to deny Ms. Stoltz equal protection, equal opportunity, and equal conditions of employment. They collectively acted to deny her a reasonable accommodation and authorized retaliatory discipline.

I will grant defendants' summary judgment motion for Ms. Stoltz's conspiracy claim. Ms. Stoltz presents no evidence to establish the defendants reached an agreement to deprive her of a constitutional right. There is no evidence at all of any agreement nor is there even any implication or suggestion of an agreement.

E.    Municipal Liability

A county "cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior." Berg v. Cnty. of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000). A plaintiff "must demonstrate that the violation of his rights was caused by either a policy or a custom of the municipality." Id. "Policy is made when a 'decisionmaker

possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Id. (quoting Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996)). "Customs are 'practices of state officials . . . so permanent and well settled' as to virtually constitute law." Berg, 219 F.3d at 275 (quoting Kneipp, 95 F.3d at 1212). If a policy or custom is identified, the plaintiff "must 'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" Id. at 276 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)). The municipality must take the action "with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Id. (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 407).

Ms. Stoltz alleges Lancaster County has "a pattern and practice to tolerate sexual harassment and accord [m]ale [e]mployees preferential treatment." They ignored males misuses of County computers and ignored a confession of "professional courtesy" extended to male park rangers to have sex in the park without consequences. The County also promoted Todd Hawn to interim chief ranger even though he had a "history of sexual harassment at work."

Defendants present evidence male park rangers were disciplined following inappropriate computers use, including prohibition from using the computers. The park rangers also received counseling regarding the computer policies and, upon another complaint of improper use, were reminded of the internet policy. In addition, defendants

present evidence Mr. Hawn's history of sexual harassment was one complaint by an outside vendor that Mr. Hawn flirted with her. Mr. Verne addressed the complaint with Mr. Hawn.

Ms. Stoltz fails to identify a genuine issue of material fact. No reasonable jury could find the County had a policy or custom of preferential treatment for male employees. Moreover, no reasonable jury could find the County was deliberately indifferent to a constitutional violation. They provided training and reminders and addressed sexual harassment complaints.[13]

F.    Equal Protection and Disparate Treatment

To establish an Equal Protection disparate treatment claim, a plaintiff must show "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill, 455 F.3d at 239. Disparate treatment in violation of Title VII and the PHRA "occur[s] where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." Ricci v. DeStefano, 129 S.Ct. 2658, 2672 (U.S. 2009) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-86 (1988)). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." Id. (quoting Watson, 487 U.S. at 986).

---

[13] Mr. Verne ignored the letter sent by Mr. Gajecki stating he gave "professional courtesy" to a state trooper. This alone, however, does not establish a pattern or practice of treating males differently or that Mr. Verne was deliberately indifferent.

Ms. Stoltz alleges she was the only female park ranger for Lancaster County and the male rangers were not assigned stereotypical women's work, such as secretarial and housekeeping duties. She alleges she was denied equal ranger duties when she returned to work even though she was able to perform the duties of an unarmed seasonal park ranger, a position that was not considered for her. Ms. Stoltz also states that Mr. Verne said women should not be park rangers and that he would not hire another woman. She alleges male rangers were afforded preferential treatment, their sexual misconduct was disregarded, and males were promoted despite their misconduct.

I will grant defendants' motion for summary judgment for Ms. Stoltz's Equal Protection, Title VII, and PHRA disparate treatment claims. Ms. Stoltz did not have equal ranger duties when she returned to work because her doctor restricted her to duties that could be performed with only her left hand/arm. She was not capable of performing ranger duties, even the seasonal unarmed ranger position.[14]  Also, male rangers who were ineligible to perform full ranger duties performed cleaning and secretarial

_____

[14]  A position of seasonal unarmed park ranger no longer existed in November 2007. Moreover, Ms. Stoltz could not perform the essential functions of the job, with or without a reasonable accommodation. The job's essential functions included patrolling by foot, bicycle and motor vehicle; conducting light and emergency maintenance duties; operating a 4X4 vehicle; enforcing statutes and ordinances through verbal and written warnings; detaining individuals; pursuing suspects, including climbing over and pulling up oneself over obstacles, ditches and streams, crawling in confined areas, and balancing on uneven or narrow surfaces; and performing rescue functions, administering first aid, lifting, carrying and dragging equipment or removing victims from an immediate danger.

responsibilities.[15]  Similarly, male rangers were not provided back-up, were yelled-at, received "fails to meet expectations" ratings, and were disciplined.

No reasonable juror could find Ms. Stoltz was discriminated against because of her gender.  Ms. Stoltz was not treated differently than male co-workers, and, even if she was, she cannot establish the different treatment was because of her gender.

G.    Hostile Work Environment

To state a prima facie case of sexual harassment, Ms. Stoltz must show (1) she suffered intentional discrimination because of her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would have detrimentally affected a reasonable person of the same sex in that position, and (5) a basis of employer liability is present.  Jenson v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); accord Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir.2001).

To establish a hostile work environment, the conduct must be "severe and pervasive enough to create an 'objectively hostile or abusive work environment–an environment that a reasonable person would find hostile–and an environment the victim-employee subjectively perceives as abusive or hostile.'"  Weston, 251 F.3d at 426

---

[15]  Ms. Stoltz never cleaned the bathroom or mopped the floor and took out the trash only when it was overflowing.

(quoting Harris v. Forlift Sys., Inc., 510 U.S. 17 at 21-22 (1993)). Courts look to numerous factors to determine whether an environment is hostile, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23).

The ranger station had only one lavatory/changing room. The rangers exited the changing room in a disrobed state and discussed sexual activities that demeaned women. The rangers did not listen to Ms. Stoltz 's opinions and did not always provide her backup, but the rangers also did not listen to Mr. Shaneyfelt's opinions or always provide him backup. Before 2004, some of the rangers went to a strip club. No evidence of other trips to strip clubs was presented. Mr. Gajecki wrote a letter to Mr. Verne in which he stated he had not cited a state trooper for having sex in the park. When the human resources department learned the ranger station computers may have been used for pornography, it had the information technology department conduct an investigation. In another instance, when the department had evidence a computer was used for to view and print pornography, the ranger responsible was reprimanded. When Mr. Gajecki was interim chief and he learned of possible inappropriate use, he sent a memorandum with the internet policy.[16]

---

[16] Ms. Stoltz does not claim she viewed the pornography or that the pornography was displayed in the ranger station.

Mr. Verne told Mr. Shaneyfelt that women should not be rangers. In creating a light-duty position for Ms. Stoltz, Mr. Verne assigned her maintenance duties such as cleaning toilets, would not allow her to perform ranger duties, and, in the beginning, would not allow her to wear a uniform. She did not perform the cleaning duties and testified Mr. Verne did not want her wearing the ranger uniform because people would believe she could help in emergency situations when she was not physically able to do so.

I will grant defendants' motion for summary judgment. No reasonable juror could find the offensive conduct was directed toward Ms. Stoltz or that it happened because of her gender. See Carver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005) (plaintiff failed to establish the first element where no racist comment, written or spoken was ever directed at the plaintiff and he never personally saw any racist graffiti or flyers but heard about the graffiti and flyers second-hand). Moreover, any alleged harassment was not severe or pervasive. Compare Andwers v. City. of Phila., 895 F.2d at 1472-74 (plaintiff presented a hostile work environment claim where other officers displayed pornographic material, used sexist slurs, vandalized personal property, left anonymous threatening phone calls, and used a burning agent on the female officer's clothes), with Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-440 (E.D.Pa. 2001) (finding that four incidents over eighteen months where the defendant made suggestive sexual comments, patted plaintiff on the buttocks and breast, and made harassing comments about plaintiff's family background and poverty were not sufficient to state a claim for hostile work

30

environment).

      H.     The Americans with Disability Act

The ADA prohibits discrimination against qualified individuals, defined as those able, with or without reasonable accommodation, to perform the essential functions of the job. 42 U.S.C. Sec. 12112(a), 12111(8). To establish a prima facie case of discrimination, a plaintiff must show she (1) is disabled within the meaning of the ADA; (2) is otherwise qualified for the job, with or without reasonable accommodations; and (3) was subjected to an adverse employment decision as a result of discrimination. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)). The term "reasonable accommodation" "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith." Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010) (quoting Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004)). "An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" Colwell, 602 F.3d at 504 (quoting Williams, 380

31

F.3d at 772).

In May 2007, Ms. Stoltz's doctor permitted her to return to work but required that she perform the tasks with only her left arm/hand. During the summer months, she worked at the pool, where she answered the telephone and checked pool passes. Her work restrictions required her to have a headset, which the County did not provided until her attorney intervened. When the pool closed, she did not work for two months while the ranger service attempted to create a light duty position for Ms. Stoltz. Ms. Stoltz testified that she could not patrol with the rangers because she could not defend herself, place a suspect in custody, or place handcuffs on a suspect. She also was unable to use a gun.

Ms. Stoltz now claims she could perform the essential functions of the park ranger position, whether it be a full-time park ranger or an unarmed seasonal park ranger with a reasonable accommodation. This claim is belied by the limitations placed on her by her physician, by her deposition testimony, and by the forms completed by her attorney prior to her return to work indicating the actions Ms. Stoltz could and could not perform. Her physician released her to work with the stipulation she perform tasks with only her left arm/hand. Ms. Stoltz testified she could not perform emergency maintenance duties, use a shovel or chain saw, make arrests of cooperating or resisting suspects, use force, perform searches, climb, or pull herself over obstacles, climb in confined spaces, perform rescue functions, administer first aid, bring equipment to emergency locations, remove

victims from danger, evacuate patrons, patrol the park for long periods, use a baton or

O.C. spray, or handcuff suspects. The job description with notations from her attorney

indicated Ms. Stoltz could not affect an arrest or perform rescue functions, use a fire

extinguisher, shovel, chain saw, or issued firearm, or climb over and pull up over

obstacles or crawl in confined spaces.

I will grant defendants' motion for summary judgment for Ms. Stoltz's ADA

discrimination claim. No reasonable jury could find she could perform the essential

functions of a full-time park ranger or an unarmed seasonal park ranger, with or without

an accommodation. In addition, no reasonable juror could find the defendants failed to

engage in good faith in an interactive process to develop a light-duty position for Ms.

Stoltz. They met with her and her attorney, removed items she did not agree to, and

developed a light-duty position that she could perform.

I.       Pennsylvania Political Subdivision Tort Claims Act

The Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 et

seq., provides "no local agency shall be liable for any damages on account of any injury

to a person or property caused by any act of the local agency or an employee thereof or

any other person." This immunity applies to local agencies and their employees. See

Phillips ex rel. Phillips v. Washington Cnty. Transp. Auth., 986 A.2d 925, 933 (Pa.

Commw. Ct. 2009) ("The Tort Claims Act grants employees immunity from suit for their

official acts and [plaintiff] must first prove that the employees' conduct falls within one

33

of the eight exceptions to immunity."). This immunity does not apply if "the act of the employee caused the injury and . . . such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. Ann. § 8550. The term "'willful misconduct' is synonymous with the term 'intentional tort.'" Palmer v. Bartosh, 959 A.2d 508, 512 (Pa. Commwlth. Ct. 2008) (quoting Kuzel v. Krause, 658 A.2d 856, 859 (Pa. Commwlth. Ct. 1995)).

Ms. Stoltz alleges negligent supervision and negligent infliction of emotional distress claims against individual defendants. Because the causes of action are based in negligence, they are barred by the Pennslyvania Political Sub-Division Tort Claims Act. I will grant defendants' summary judgment motion for the negligent supervision and negligent infliction of emotional distress claims.

    J.    Invasion of Privacy

        1.    Intrusion Upon Seclusion

The tort of intrusion upon seclusion is defined as: "[I]ntentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts sec. 652B.

"Intrude" means "to thrust oneself in without invitation, permission, or welcome." O'Donnell v. United States, 891 F.2d 1079, 1083 (3d Cir. 1989) (quoting Webster's Third New Internation'l Dictionary 1187 (1966)). The tort of intrusion upon seclusion occurs

"(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into plaintiff's private concerns." Harris by Harris v. Easton Publ'g Co., 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984) (citing Restatement (Second) of Torts § 652B, comment b).

Some examples of this tort include: a reporter taking a photograph of a person who refused to see him; a private detective who rents a room, looks into a plaintiff's bedroom windows through a telescope and takes pictures with a telescopic lens; a defendant who taps telephone wires and installs a recording device; use of a forged court order to examine bank records; and a professional photographer calling someone everyday for a month at inconvenient times to insist she come to his studio to be photographed. See Restatement (Second) of Torts § 652B, Illustrations.

Because Ms. Stoltz informed Mr. Verne, Ms. Ashworth, Mr. Hackett and Mr. Gajecki of her health concerns, they did not intrude upon her seclusion. There is no evidence that any of them "intruded" or that anyone with whom Ms. Stoltz worked did anything to investigation or examine her private affairs. I will grant defendants' motion for summary judgment for Ms. Stoltz's intrusion upon seclusion claim.

2.    False Light

The tort of false light invasion of privacy provides that a person is liable if he:

[G]ives publicity to a matter concerning another that places the other before

the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Weinstein v. Bullick, 827 F. Supp. 1193, 1202 (E.D. Pa. 1993) (quoting Restatement (Second) of Torts § 652E). "The 'false light' tort differs from a claim of defamation in at least two respects: publicity (i.e. widespread dissemination) is required, rather than mere publication; and the false statement or imputation need not be defamatory." Id. (quoting Bromhall v. Rorvik, 478 F. Supp. 361, 367 (E.D. Pa. 1979)). "'Publicity,' as an element of the tort of invasion of privacy, 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" Curran v. Children's Serv. Ctr. of Wyoming Cnty., Inc., 578 A.2d 8, 12 (Pa. Super. Ct. 1990) (quoting Restatement (Second) of Torts, § 652D, comment a).

I will grant defendants' summary judgment motion for Ms. Stoltz's false light invasion of privacy claim. No reasonable juror could find that allegedly false statements about Ms. Stoltz's medical condition to her co-workers constituted "publicity." Marion v. City of Phila., 2002 WL 31761426, at *5 (E.D. Pa. Dec. 9, 2002) (where an evaluation was forwarded only to the company's personnel, the plaintiff did not establish widespread dissemination). It was not made to "so many persons that the matter must be regarded as substantially certain to become one of public knowledge."

K.    <u>Defamation</u>

To prove a claim of defamation, the plaintiff must show:

> (1) The defamatory character of the communication[;] (2) Its publication by
> the defendant[;] (3) Its application to the plaintiff[;] (4) The understanding by
> the recipient of its defamatory meaning[;]   (5) The understanding by the
> recipient of it as intended to be applied to the plaintiff[;] (6) Special harm
> resulting to the plaintiff from its publication[; and] (7) Abuse of a
> conditionally privileged occasion.

42 Pa. Cons. Stat. Ann. § 8343. "A communication is defamatory if it tends to harm the

reputation of another as to lower him in the estimation of the community or to deter third

persons from associating or dealing with him." <u>Maier v. Maretti</u>, 671 A.2d 701, 704 (Pa.

Super. Ct. 1995) (citing <u>Elia v. Erie Ins. Exchange</u>, 634 A.2d 657 (1993)). "A

communication is also defamatory if it ascribes to another conduct, character or a

condition that would adversely affect his fitness for the proper conduct of his proper

business, trade or profession." <u>Id.</u> (citing <u>Gordon v. Lancaster Osteopathic Hosp. Ass'n</u>,

489 A.2d 1364 (Pa. Super. Ct. 1985)).

It is for "the court to determine whether the communication complained of is

capable of a defamatory meaning." <u>Maier</u>, 671 A.2d at 704 (citing <u>Rybas v. Wapner</u>, 457

A.2d 108 (1983)). To determine whether a communication is defamatory, a court "must

consider the effect the statement would fairly produce, or the impression it would

naturally engender, in the minds of the average persons among whom it is intended to

circulate." <u>Id.</u> The court also must consider "the nature of the audience hearing the

remarks." Id. "[C]ommunications which may annoy or embarrass a person are not sufficient as a matter of law to create an action in defamation." Id. (citing Gordon, 489 A.2d at 1369). "[O]nly statements of fact can afford a basis for a defamation action; expressions of opinion cannot." Smith v. Sch. Dist. of Phila., 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000); accord Parano v. O'Connor, 641 A.2d 607, 609 (Pa. Super. Ct. 1994) ("expressions of his opinion, . . . are not actionable unless they imply undisclosed, false and defamatory facts").

Ms. Stoltz alleges defendants made false accusations that Ms. Stoltz was "faking her injury," made comments that questioned the validity of her disability, and made false accusations that Ms. Stoltz was insubordinate.

The comments are not defamatory. The comment that Ms. Stoltz was faking her injury was an opinion, which is not defamatory. In addition, although the comment that Ms. Stoltz was insubordinate may have embarrassed or annoyed Ms. Stoltz, it is not sufficient to establish defamation. Therefore, I will grant defendants' motion for summary judgment for Ms. Stoltz's defamation claim.

L.    Intentional Infliction of Emotional Distress

To establish an intentional infliction of emotional distress claim, the plaintiff must prove: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused emotional distress; and (4) the resultant emotional distress was severe." Dull v. W. Manchester

38

Twp. Police. Dept., 604 F. Supp. 2d 739, 755-56 (M.D. Pa. 2009) (quoting Bruffett v. Warner Commc'ns, Inc., 692 F.2d 910, 914 (3d Cir. 1982))..

Courts are cautious "to declare conduct 'outrageous' so as to permit recovery." Project Mgmt. Inst., Inc. v. Ireland, 2000 WL 375266, at *6 (E.D. Pa. Apr. 11, 2000) (citing Clark, 890 F.2d at 623). Usually "it is insufficient 'that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle plaintiff to punitive damages for another tort." Id., at *6 (citing Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998)). The defendant's misconduct must be "so extreme and outrageous that it 'go[es] beyond all possible bounds of decency, and . . . [is] regarded as atrocious, and utterly intolerable in a civilized society.'" Dull, 604 F. Supp. 2d at 755-56 (quoting Wilkes v. State Farm Ins. Co., 2005 WL 1667396, at *4 (M.D. Pa July 15, 2005)); Hoy, 720 A.2d at 754 (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (1987)). In the employment context, it is rare to find conduct that rises to the required "extreme and outrageous" level. Cox v. Keystone Carbon, 861 F.2d 390, 395 (3d Cir. 1988) (citing Rinehimer v. Luzerne Cnty. Cmty. Coll., 539 A.2d 1298, 1305 (Pa. Super. Ct. 1988)). "[I]t is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." Swisher v. Pitz, 868 A.2d 1228, 1231 (Pa. Super. Ct. 2005) (quoting Johnson v. Caparelli, 625 A.2d 668, 671 (Pa. Super. Ct. 1993)).

Ms. Stoltz maintains Mr. Verne did not believe women should be park rangers, and told her to "leave and do the County a favor." Mr. Gajecki gave Ms. Stoltz a negative performance review, and Mr. Hackett was present when the review was given to Ms. Stoltz. These allegations do not rise to the level of "extreme and outrageous" required to establish an intentional infliction of emotional distress claim. I will grant defendants' motion for summary judgment for this claim.

M.    Assault and Battery

The Worker's Compensation Act provides:

> If disability or death is compensable under this act, a person shall not be liable to anyone at common law or otherwise on account of such disability or death for any act or omission occurring while such person was in the same employ as the person disabled or killed, except for intentional wrong.

77 P.S. § 72. To determine whether a wrong is "intentional" for purposes of the co-employee exception, courts consider whether the wrong is one "normally expected to be present in the workplace," see McGinn v. Valloti, 525 A.2d 732, 735 (Pa. Super. Ct. 1987), and whether it was motived by personal animus, see Sabot v. Dep't of Public Welfare, 588 A.2d 597, 600 (Pa. Cmmwlth. Ct. 1991).

The United States District Court for the Eastern District of Pennsylvania found a claim of assault barred where the plaintiff was a security personnel employee because the assault was not outside the range of normal expectation for someone who provided security and there was not evidence of personal animus. Wakshul v. City of Phila., 998 F.

Supp. 585, 589 (E.D. Pa. 1998). In addition, a court in United States District Court for the Western District of Pennsylvania found the claims barred where the plaintiff was a truck driver because speeding, tailgating, and poor weather conditions, were in the normal course of employment for a truck driver. Holdampf v. Fid. & Cas. Co., 793 F. Supp. 111, 114 (W.D. Pa. 1992).

Ms. Stoltz alleges Mr. Verne had contempt for women rangers and shoved her. This claim is barred by the Worker's Compensation Act. Shoving is in the normal course of employment for a ranger.

## IV.    CONCLUSION

I will grant defendants' motion for summary judgment and grant judgment in favor of defendants and against Ms. Stoltz.

An appropriate order follows.